**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

**UNITED STATES OF AMERICA**

**vs.**                                    **Case No. 3:11-cr-71(S1)-J-32JRK**

**BRIAN RUSSELL POLLOCK
    a/k/a mrsmitty**

_____

## REPORT AND RECOMMENDATION[1]

### I.  Status/Background

This cause is before the Court on two matters:

1.    The issue of Defendant's competency to proceed; and

2.    Defendant's Motion for Abatement of Trial and Incorporated Memorandum of

Law (Doc. Nos. S-11, 194; "Motion to Abate"[2]), to which the Government has responded in

opposition, see United States' Response in Opposition to Defendant's Motion for Abatement

of Trial (Doc. Nos. S-12, 195; "Response to Motion to Abate"[3]).

---

[1]      Within fourteen (14) days after service of this document, specific, written objections may be filed in accordance with 28 U.S.C. § 636, Rule 59, Federal Rules of Criminal Procedure, and Rule 6.02(a), Local Rules, United States District Court, Middle District of Florida.  Failure to file a timely objection waives a party's right to review.  Fed. R. Crim. P. 59; United States v. Garcia-Sandobal, 703 F.3d 1278, 1283 (11th Cir. 2013).

[2]      The Court originally directed that the Motion to Abate be filed in camera (Doc. No. 182), but upon review of it, by Order entered May 14, 2013 (Doc. No. 192), the Court directed Defendant to file on the public docket a version that does not contain confidential medical information.  The version that does not discuss confidential medical information is Doc. No. 194, filed May 16, 2013; the version that discusses medical information is maintained under seal as Doc. No. S-11, filed March 28, 2013. Defendant also filed an in camera supplement to the Motion to Abate (Doc. No. S-211) on August 9, 2013, in which he updates the Court regarding his medical ailments.

[3]      The Court originally directed that the Response to Motion to Abate be filed in camera if it discussed confidential medical information (Doc. No. 182), but upon review of it, by Order entered May 14, 2013 (Doc. No. 192), the Court directed the Government to file on the public docket a version that does not contain confidential medical information.  The version that does not discuss confidential medical information is Doc. No. 195, filed May 16, 2013; the version that discusses medical information

This case was brought in March 2011.  See Indictment (Doc. No. 1).  Defendant is charged with advertising, receiving, possessing, and attempting to transport child pornography.  See Superseding Indictment (Doc. No. 88) at 1-10.[4]  The crimes are alleged to have occurred in January, June, July, August, and October of 2010.  Id.

Although Defendant has engaged in some substantive pre-trial litigation and was at one time within days of being brought to trial, the main focus of the case has been Defendant's medical condition.  He suffers from stage IV AIDS, diabetes, and a variety of other medical ailments.  Defendant's medical diagnoses are no doubt serious, but as explained in more detail below, there is quite a bit of evidence to suggest that: 1) he has purposely caused his condition to worsen at critical stages in the case,[5] including to avoid facing trial; and 2) he has feigned and/or exaggerated some of the symptoms of his illnesses in furtherance of his efforts to avoid facing trial.[6]

---

is maintained under seal as Doc. No. S-12, filed May 6, 2013.

[4]     The counts set forth in the superseding indictment are as follows: knowingly advertising to receive and exchange a visual depiction involving the use of a minor engaging in sexually explicit conduct, in violation of 18 U.S.C. §§ 2251(d)(1)(A), (2)(A), and 2251(e) (counts I, II, III, IV, V, VI, and VII); knowingly receiving a visual depiction using a means and facility of interstate and foreign commerce, the production of which involved the use of minors engaging in sexually explicit conduct, which visual depiction was of such conduct, in violation of 18 U.S.C. §§ 2252(a)(2) and 2252(b)(1) (counts VIII, IX, X, and XI); knowingly attempting to transport and ship, using a means or facility of interstate and foreign commerce, a visual depiction, the production of which involved the use of minors engaging in sexually explicit conduct, which visual depiction was of such conduct, in violation of 18 U.S.C. §§ 2252(a)(1) and 2252(b)(1) (count XII); and knowingly possessing one or more matters containing visual depictions produced using materials shipped and transported in and affecting interstate and foreign commerce, the production of which visual depictions involved the use of minors engaging in sexually explicit conduct and which visual depictions were of such conduct, in violation of 18 U.S.C. §§ 2252(a)(4)(B) and 2252(b)(2) (counts XIII and XIV).  See Superseding Indictment (Doc. No. 88) at 1-10.

[5]     The undersigned sometimes refers to this behavior as "manipulating."

[6]     The undersigned sometimes refers to this behavior as "malingering."

2

In March 2013, after the case had been pending for two years, Defendant filed the instant Motion to Abate in which he argues that his physical condition has declined to the point that he cannot "withstand the rigors of trial" and "[h]is declining health is causing memory loss issues which make him unable to assist counsel in his own defense[.]" Motion to Abate at 1.  In response to the Motion to Abate and the claim in it that Defendant now suffers from AIDS-related dementia, the Government moved the Court for a mental competency examination and for an independent medical examination ("IME").  See United States' Motion for Examination to Determine Mental Competency of Defendant (Doc. No. 193), filed May 15, 2013; Response to Motion to Abate.  Regarding the mental competency examination, the Government advocated for a thirty-day commitment, as permitted by 18 U.S.C. § 4247(b), and suggested the appropriate place for the examination would be the Federal Medical Center in Butner, North Carolina ("FMC Butner").  See United States' Reply to Defendant's Response to Government's Motion for Examinations (Doc. No. 205) at 5-10.  The Government also suggested that the IME be completed at FMC Butner.  Id. at 5-6.

Defendant vigorously opposed the Government's request for a mental competency examination and for a thirty-day commitment to accomplish the examination, but he did not oppose the request for an IME.  See, e.g., Defendant's Response to Government's Motion for Examinations (Doc. No. 199).  In opposing a thirty-day commitment, Defendant contended that the commitment could have drastic consequences on his health, both physically and mentally.  See id.; Order (Doc. No. 229) at 25.

The undersigned held a full-day evidentiary hearing on October 1, 2013 and heard argument of counsel on October 4, 2013.  See Minute Entries (Doc. Nos. 225, 228).  By

3

Order entered October 10, 2013 (Doc. No. 229), the undersigned found reasonable cause to believe Defendant might have been suffering from a mental disease or defect rendering him mentally incompetent to proceed and committed Defendant pursuant to 18 U.S.C. §§ 4241 and 4247 to the custody of the Attorney General or his duly authorized representative for placement in a suitable facility for a reasonable period, not to exceed thirty (30) days, for a psychiatric or psychological examination to determine if he was competent to stand trial. The undersigned also directed that evaluators complete an IME if practical within the time permitted for the psychiatric/psychological examination.

Defendant sought reconsideration of the commitment Order by the Honorable Timothy J. Corrigan, United States District Judge (Doc. No. 231). Judge Corrigan reconsidered, affirmed the undersigned's commitment Order, and ordered Defendant to self-report to FMC Butner by noon on October 30, 2013 (Doc. Nos. 236, 237, 239). Defendant took an interlocutory appeal of the commitment decision to the United States Court of Appeals for the Eleventh Circuit, and he also filed an emergency motion to stay the date he was to self-report for the examination (Doc. Nos. 240, 241). On October 28, 2013, the Eleventh Circuit denied Defendant's emergency motion to stay (Doc. No. 245).

In accordance with the Court's instructions, Defendant self-reported to FMC Butner on October 30, 2013 for the examinations. See Notice of Defendant's Self-Report to FMC Butner for Competency Evaluation (Doc. No. 246). On November 20, 2013, pursuant to Defendant's motion for voluntary dismissal, the appeal was dismissed by the Eleventh Circuit (Doc. No. 247). On December 12, 2013, the Court received a report from evaluators at FMC Butner that indicated Defendant had been released from the facility on November 25, 2013,

4

see Order (Doc. No. 256), and in which evaluators opined Defendant is incompetent to proceed to trial but his competence may be restored with proper treatment of his AIDS and other medical ailments.

A status hearing was held on December 17, 2013 and a two-day evidentiary hearing on the issue of Defendant's competency to proceed and the Motion to Abate was set. Id.; Minute Entry (Doc. No. 255); see also Order Rescheduling Hearing (Doc. No. 257). Evidentiary hearings were held before the undersigned on February 6-7, 2014,[7] March 10, 2014,[8] and March 13, 2014,[9] during which the Court heard from multiple witnesses and received, without objection, Government's Exhibits 1-3 and Defendant's Exhibits 1-17.[10]

The witnesses who testified at the hearings are as follows: 1) Bryon L. Herbel, M.D., a staff psychiatrist at FMC Butner, who participated in Defendant's examination (witness for the Government); 2) Robert E. Cochrane, Psy.D., ABPP, a psychologist at FMC Butner, who participated in Defendant's examination (witness for the Government); 3) George M. Joseph, M.D., Defendant's treating psychiatrist for approximately two years (witness for Defendant);

---

[7]     See Minute Entry (Doc. No. 264); Transcript (Doc. No. 268; "2/6/14 Tr."); Minute Entry (Doc. No. 266); Transcript (Doc. No. 271; "2/7/14 Tr."). Citations to these transcripts are to the pagination assigned by the court reporters (rather than the electronic filing system).

[8]     See Minute Entry (Doc. No. 274). This hearing has not been transcribed by a court reporter.

[9]     See Minute Entry (Doc. No. 278). This hearing has not been transcribed by a court reporter.

[10]     Hereinafter, all references to exhibits are to the exhibits that were received during the hearings on the instant issues. All of the exhibits except Government's Exhibit 3 are filed under seal because they contain confidential medical information. See Order (Doc. No. 280). Almost all of the exhibits, however, were testified about at length during the open hearings on these matters. Given that the exhibits were testified about publicly, the undersigned discusses and cites to some of the exhibits. However, given the privacy concerns of Defendant, the undersigned's discussion of the medical evidence is carefully tailored to avoid exposing unnecessary details.

4) Elizabeth Tannahill Glen, Psy.D., ABPP-CN, a clinical neuropsychologist at the University of Florida Department of Neurology, who treated Defendant one time on August 28, 2013 (witness for Defendant); 5) John Edmondson, Defendant's partner (witness for Defendant); and 6) Ne 'Tosha Dopson, P.A., Defendant's treating physician's assistant at the AIDS Healthcare Foundation/Clinic for approximately nine years (witness for Defendant).[11]

Following the evidentiary hearings, with the Court's permission, Defendant filed under seal a number of updates regarding his medical condition.  See Doc. Nos. S-281, S-284, S-288, S-292, S-294, S-297, S-303, S-306.  After reviewing these updates and receiving status reports from Defendant's pretrial services officer, the Court held a status hearing on July 18, 2014,[12] during which Defendant's composite Exhibits 18 and 19 were received and filed under seal, and during which further argument was heard.  Following the July 18, 2014 status hearing, the Government filed a Notice Regarding Defendant's Current Health Status (Doc. No. 309) to which Defendant responded (Doc. No. 310).  Defendant also filed under seal on August 18, 2014 another update regarding his medical condition (Doc. No. S-313).

## II.  Discussion

The Court must decide whether an undisputedly incompetent Defendant whose incompetence is tied to, and indeed a result of, his serious medical ailments must undergo a reasonable period of treatment and attempted restoration as mandated by 18 U.S.C. §

---

[11]     Prior to working for the AIDS Healthcare Foundation, Ms. Dopson was a physician's assistant with the Duval County Health Department.  She initially started treating Defendant in approximately 2005 while working at the Health Department, and she has continued treating Defendant in her current position.

[12]     See Minute Entry (Doc. No. 307).  This hearing has not been transcribed by a court reporter.

6

4241(d); or whether the case should be abated indefinitely given the seriousness of Defendant's medical issues and his alleged inability to physically stand trial because of them. The tension between Defendant's serious medical infirmities and his purposeful efforts to make his condition worse at critical junctures in the case, as well as his efforts to feign and exaggerate some of the symptoms of his illnesses, complicate the resolution of the pending issues. Recognizing that Defendant's medical ailments are significant and predicted by some medical professionals to lead to death in the near future, and observing that resolving this question is undoubtedly complicated by Defendant's past manipulative efforts to avoid his trial and his malingering, the undersigned finds that the proper course of action is to commit Defendant for a reasonable period of treatment and attempted restoration of his competency under § 4241 and to deny without prejudice Defendant's Motion to Abate.

## A.  Facts/Parties' Positions

The rich background of the case preceding the matters currently before the Court is summarized in the undersigned's initial thirty-day commitment Order that was entered on October 10, 2013 (Doc. No. 229 at pp. 3-13) and need not be repeated in full here. Suffice it to say that the main reason the undersigned deemed it appropriate to commit Defendant for a thirty-day evaluation at FMC Butner in October 2013 (instead of directing an outpatient examination locally) was because of the evidence suggesting that Defendant had been manipulating his medical condition by making himself ill to avoid facing trial. See id. at 23-25. To briefly summarize the time line of evidence of manipulation:

- After being detained pending trial as a danger to the community in April 2011, Defendant claimed the pretrial detention facilities were not providing him with proper care, and he lost something like 60 to 70 pounds in six months of incarceration;

7

- The undersigned held numerous hearings to attempt to determine the cause of the weight loss; although there was no evidence of wrongdoing by the facilities, it could not be explained why Defendant was losing so much weight;

- Ultimately, the undersigned released Defendant in October 2011 under stringent pretrial release conditions because of fear at the time that the alleged poor care was having dire consequences on Defendant's health, a decision that the undersigned has since determined was influenced by Defendant's purposeful efforts to make himself ill and deceive the Court;

- Upon being released, Defendant appeared to have gained back the weight he had lost in pretrial detention and by all accounts, his health was on the rise;

- After obtaining a number of continuances totaling about one year and after being warned that the Court would not consider further continuances, Defendant sought another continuance in September 2012 so he could undergo two then-elective surgeries to his parotid glands[13];

- In denying the requested continuance on September 27, 2012, the undersigned observed that Defendant was suffering minimal, if any, pain; he had no weight loss which suggested no problems eating; any pain could be treated by aspiration or an over-the-counter medication; there was no evidence that Defendant could not effectively participate in his defense; and a long recovery from each surgery would likely be necessary and result in a further delay of the trial;

- The same day the continuance was denied, Defendant moved for a status conference in front of Judge Corrigan and again advocated for a continuance of the trial during the October 2, 2012 status conference, claiming his health had deteriorated in the five days following the denial of the continuance to the point that he was unable to assist his counsel in any meaningful way; he also claimed that he was in serious pain, was unable to eat, was losing weight, and was unable to take his daily AIDS medications;

---

[13] "[W]hile there appeared to be a genuine need for the surgeries, the medical issues related to Defendant's jaw were neither life-threatening nor terminal, and they did not pose an immediate danger to Defendant's health."  Order (Doc. No. 229) at 9 (citation omitted).

- Judge Corrigan held another status hearing on October 4, 2012 (seven days after the undersigned's denial of the requested continuance), and announced his intention to deny the renewed request for a continuance and proceed with the trial on October 9, 2012;

- During a recess of the October 4, 2012 status conference, after Judge Corrigan's announcement, Defendant seemingly became rather ill;

- At the end of the October 4, 2012 status conference, Defendant once again requested a continuance of the trial (which was set to begin five days later);

- Judge Corrigan entered an Order on October 5, 2012 granting a continuance for the surgeries but recognizing the possibility that Defendant was manipulating his already poor health to avoid trial;

- Even though Defendant was apparently too ill to proceed with his trial, he was well enough to undergo surgery on his jaw on October 12, 2012, just three days after the trial would have begun but for the continuance.

Order (Doc. No. 229) at 4-12.  In addition, Defendant had changed counsel four times during the course of the case for a total of five different sets of lawyers (some had co-counsel), and he had sought and obtained at least ten continuances of his trial totaling more than two and one-half years.  Id. at 5, 8, 22.  Defendant claimed not to be able to assist his counsel due to memory loss in his Motion to Abate, but he appeared to be an excellent historian and messenger regarding his various medical ailments and corresponding symptoms.  Id. at 23. He also presented differently in Court than he conducted himself when he believed no one was watching: although he used a wheelchair and oxygen and appeared very frail in Court, video surveillance taken by the Federal Bureau of Investigation showed him walking to and from a car in a parking lot outside his home without oxygen and acting very alert.  Id.  Given all of this evidence, a thirty-day inpatient evaluation carried with it the best chance of uncovering which of his claimed symptoms were real and which were not.

Not surprisingly, when Defendant was committed to FMC Butner for the thirty-day evaluation, evaluators noticed some red flags that would tend to suggest serious manipulation, but they also observed a number of symptoms and behaviors that appeared to be legitimate.  See generally FMC Butner Medical Records (Gov.'s Ex. 1) at bates stamped pages 229-59 ("FMC Butner Report"[14]).  Perhaps the biggest red flag had to do with the medication list that was provided to evaluators upon Defendant's arrival at the facility.  The Court had ordered Defendant to "bring[] with him a list of all his current medications, and . . . ensure that a family member has the medications available in the event that FMC Butner does not immediately have one or more of the medications and determines it is appropriate to continue them."  Order (Doc. No. 229) at 31.  Consistent with the Court's instructions, Defendant's counsel forwarded a list of Defendant's medications to staff at FMC Butner.  FMC Butner Report at 8.  The list had been compiled by Mr. Edmondson, Defendant's partner.  2/7/14 Tr. at 189, 194.  On the list of medications was the drug "Atripla," which is a pill containing three drugs that is prescribed to some HIV patients to combat the virus.  FMC Butner Report at 8; Gov's Ex. 2.  Given that "the HIV genotype obtained at FMC Butner indicated [Defendant's] HIV infection was resistant to one of the drugs in Atripla," staff at FMC Butner "phoned [Defendant's] partner Mr. Edmondson to inquire about this discrepancy in [Defendant's] care, since Ms. Dopson [(Defendant's treating physician's assistant)] had previously discontinued Atripla and prescribed [a different] three drug regimen."  FMC Butner Report at 8.  When asked about the discrepancy

---

[14]     Hereinafter, citations to the FMC Butner Report will be to the pagination assigned by evaluators (not the bates stamped numbers of the overall Government's Exhibit 1).

by an evaluator at FMC Butner, Mr. Edmondson indicated that he got the name of Atripla

from a pamphlet in his and Defendant's residence.  Id.  He also "affirmed [Defendant] had

been prescribed a three drug HIV regimen instead of Atripla."  Id.  Then, evaluators called

Ms. Dopson, Defendant's treating physician's assistant. 2/6/14 Tr. at 34.  Ms. Dopson said

Defendant had been prescribed Atripla at some point in the past, but that medication had

been discontinued.  Id.

Evaluators stated the following in the FMC Butner Report regarding the Atripla mix

up:

> This discrepancy creates uncertainty about which HIV regimen [Defendant] had
> been ingesting while residing in the community.  If [Defendant] had been
> ingesting Atripla instead of the three drug regimen, this could plausibly account
> for the worsening of his immune status in the months preceding his arrival at
> FMC Butner.  The current three drug regimen should be effective at treating
> [Defendant's] HIV disease, as reflected by the screening HIV genotype.  If
> [Defendant's] health would fail to recover on this three drug regimen, then the
> most likely possibilities would be non-adherence to the medicine or a
> gastrointestinal malabsorption syndrome.

FMC Butner Report at 8.

Mr. Edmondson testified about the Atripla mix up during the February 7, 2014

hearing.  See 2/7/14 Tr. at 189-207.  According to Mr. Edmondson, he compiled the

medication list for FMC Butner by reviewing a medication list from Shands (a hospital in

Jacksonville) and by reading the labels of all of Defendant's pill bottles that were located on

the bathroom counter.  Id. at 197.  Atripla did not appear on the Shands medication list.  See

id. at 195. Mr. Edmondson further confirmed that on the bathroom counter, there were three

pill bottles containing the three different HIV drugs Defendant was actually taking instead

of Atripla.  Id. at 197-98.  He claimed that he wrote down the name of Atripla on the

11

medication list rather than the actual medication names because he saw a "pamphlet" on the counter and he "thought it was the name of the cocktail."  Id.

According to Mr. Edmondson, he prepared the medication list without any assistance from Defendant, and Defendant did not review the list.  Id. at 203.  Mr. Edmondson provided the list directly to Defendant's counsel, who in turn provided it to FMC Butner.  Id.  Curiously, though, the FMC Butner Report states that Defendant "reported most recently being prescribed Atripla, but will not know whether the drug effectively treats his condition for several more months."  FMC Butner Report at 4.[15]

Ms. Dopson also testified about the Atripla mix up.  She has never prescribed Atripla for Defendant because she knows Defendant is resistant to one of the drugs in it.  See Def.'s Exs. 12, 13 (pharmacy-authored medication lists spanning from 1998 to 2014).  She was surprised by the telephone call from the evaluator at FMC Butner asking her whether she had prescribed Atripla.  And, when she later talked to Defendant and Mr. Edmondson about the mix up, they did not inform her that Mr. Edmondson was the one responsible for the misunderstanding about the medication, even after she questioned how it could have happened.  Rather, Mr. Edmondson told her FMC Butner had that medication on record for Defendant, without explaining why they did.  Ms. Dopson confirmed that Defendant and Mr. Edmondson acted just as puzzled as she was about how Atripla could have made it on Defendant's medication list.  Ms. Dopson also indicated that both Mr. Edmondson and Defendant are good historians regarding Defendant's medical situation, although sometimes

---

[15] When asked about Atripla during the February 7, 2014 hearing, Dr. Herbel could not find "any evidence in the record where [Defendant] affirmed that he was on Atripla or not."  2/7/14 Tr. at 48. It appears Dr. Herbel simply overlooked the FMC Butner Report that clearly indicates Defendant reported being recently prescribed Atripla.  See FMC Butner Report at 4.

when she meets with them, Defendant forgets certain details that Mr. Edmondson fills in for him.  Further, Ms. Dopson testified that Mr. Edmondson should be knowledgeable regarding the medications Defendant is taking, and she was surprised to learn (presumably during her testimony at the hearing) that Mr. Edmondson put Atripla on the medication list for FMC Butner.

In addition to preparing the medication list and consistent with the Court's instructions, Mr. Edmondson (and presumably Defendant's sister/third-party custodian) took to FMC Butner a bag containing all of the medications that Defendant was taking.  2/7/14 Tr. at 205.  According to Mr. Edmondson, that bag contained the three HIV medications Defendant was actually taking, rather than Atripla.  Id. at 190-91, 198.  Surprisingly to the undersigned, even though a staff member of FMC Butner had indicated it would be preferable for Defendant to bring his current medications in case one was not immediately available, and even though the Court had ordered Defendant to take the medications with him, staff at FMC Butner threw away all of the medications provided by Defendant.  Id. at 14-15.  The staff did so apparently without even comparing the actual medications to the listed ones and ensuring the list's accuracy.  Id.  So, in other words, there is no way to confirm one way or the other what medications Defendant actually brought with him.  One thing is for sure: had a genotype test not been performed and the mystery not solved, Defendant would have been ingesting HIV medication that he had not been prescribed and that his virus resists for his entire stay at FMC Butner.[16]  Given that Defendant had

---

[16]    Instead, Defendant ingested Atripla at FMC Butner for about six days prior to the discrepancy being caught.

13

vigorously opposed the examination and claimed his physical/mental condition would almost no doubt worsen if he were committed, it is very suspicious that Defendant's partner wrongly listed a medication that Defendant's virus resists and that Defendant inaccurately reported recently being prescribed that same medication.[17]

Other red flag-type issues during Defendant's stay at FMC Butner included the following.  Defendant "required some minimal assistance in dressing and bathing from the inmate companions, although he was more capable in self-care than he initially presented himself." FMC Butner Report at 9.  Defendant arrived at FMC Butner with oxygen (just as he presents in Court), but a "review of records showed no indication that supplemental oxygen was medically necessary." Id.  One evening, about three days after Defendant's medication regimen was changed from Atripla to the correct regimen, 2/6/14 Tr. at 64, a nurse observed Defendant leave two of his pills in his pill cup, and when confronted, Defendant "stated he was waiting for crackers," FMC Butner Report at 9; see also 2/6/14 Tr. at 63.  A sampling of Defendant's phone calls recorded early in his stay revealed that he spoke normally and was more alert than he appeared clinically, but during later calls, he "spoke in a much slower, softer fashion," and his "speech and demeanor w[ere] remarkably more impaired than [calls from] two weeks earlier."  FMC Butner Report at 12.  Evaluators opined "[i]t is unlikely [Defendant's] cognitive function declined that rapidly and drastically in just 14 days." Id. at 19.

---

[17]    The undersigned discredits Mr. Edmondson's explanation about why he allegedly mistakenly listed Atripla.  It is belied by Defendant's report of recently being prescribed Atripla and Ms. Dopson's unbiased testimony that Mr. Edmondson and Defendant told her they did not know how FMC Butner had Atripla listed.

14

The red flags continued with the psychological interviews and testing. During interviews, Defendant presented as confused about the date and about his age, "which is unusual except for patients with severe, late stage dementia." Id. at 12.  Scores on several of the psychological tests indicated to evaluators that Defendant was likely exaggerating deficits or putting forth poor effort during testing.   Id. at 13-15.   Scores on neuropsychological tests indicated that "although [Defendant] was cooperative with the testing process, effort testing indicates he may not have been putting forth his best effort[.]" Id. at 17.  During the neuropsychological evaluation, Defendant demonstrated "behaviors/ performances" that "are unlikely and inconsistent with known patterns of brain dysfunction." Id. at 19.[18]

There were also a number of red flags concerning Defendant's knowledge of the charges in the case and the proceedings against him.  Regarding Defendant's factual understanding of the proceedings, Defendant reported to evaluators "being charged with 'child pornography'" and "stated the pictures allegedly involved 'naked children' that were addressed and mailed to him at his home." FMC Butner Report at 25 (quoting Defendant). The charges in the case actually revolve entirely around child pornography from the internet, not received in the mail.  Defendant also "initially reported not understanding the purpose of a trial," id. at 26, which is hard to believe given that in October 2012, Defendant's trial was set to begin within a matter of days but was continued because of his health.  When asked who represented him, Defendant indicated it was "'Alan, and a woman too,'" id. at 28

---

[18]     Dr. Cochrane also testified about the psychological evaluation and testing/results.  See 2/7/14 Tr. at 98-107, 110-14.  Of all of the objective measures (including testing), Dr. Cochrane opined "some suggested, you know, some exaggeration may be present.  Others did not suggest that." Id. at 118.

(quoting Defendant), even though his current counsel are Mark Rosenblum and Vanessa Zamora Newtson, and they have been for more than two years (Alan Ceballos previously represented Defendant).

Evaluators at FMC Butner ultimately opined that Defendant is mentally incompetent to proceed to trial, id. at 29, an opinion that somewhat surprised the undersigned given all of the red flags that they encountered during the evaluation.  The parties do not dispute this opinion.  When asked why he did not diagnose malingering, Dr. Cochrane testified that the diagnosis is "typically reserved for gross . . . exaggeration"; "It was unclear at what level of exaggeration was going on here, but [he] did not feel [there] was enough evidence to say it was gross exaggeration."  2/7/14 Tr. at 116.

According to evaluators:

In summary, [Defendant] suffers from AIDS related dementia that is considered mild to moderate at this time.  Further, he has some mild depressive symptoms and reports being in considerable pain.  However, it is unclear to what degree he may be exaggerating his deficits.  Some cognitive impairments are likely genuine.  All of these conditions and issues, along with possible confounding medication effects, impede his competency abilities in some respects. [Defendant] has several competency strengths, such as a basic understanding of many fundamental legal issues and the court process; rational thinking; appropriate interpersonal behavior; and ability to learn with repetition.  However, his poor attention and concentration, poor recall for details, and his slow information processing interfere with his ability to consult effectively with counsel and participate fully in the proceedings.  Given this, he is considered not competent to stand trial.

[Defendant's] deficits are primarily attributed to his persistent HIV disease and associated compromised immune status, which is most likely due to nonadherence to the presumably adequate treatment recommendations while at home prior to his arrival at FMC Butner.  The alternative explanation of malabsorption is possible, but less likely, given the discrepancy in the HIV medicine treatment in the medication list provided to the medical staff when [Defendant] arrived at FMC Butner as described previously.  The deficits of his HIV disease would include any cognitive impairment which is genuinely present.

16

> However, there is evidence in the medical literature his AIDS related symptoms may be at least partly reversible with effective treatment of the HIV disease, which he is currently prescribed.  Insufficient time has elapsed to determine the full effect of this treatment.  It is expected his condition will improve slowly over the next several months, as long as he is adherent to the recommended treatment.   Given this, there is a substantial probability [Defendant's] competency to stand trial will be restored as his medical condition improves. Therefore, it is recommended he be committed for a period of competency restoration, pursuant to Section 4241(d) of Title 18.

FMC Butner Report at 29-30; see also, e.g., 2/6/14 Tr. at 57-61; 2/7/14 Tr. at 39-40.

During the evidentiary hearing before the undersigned on February 6, 2014, Dr. Herbel testified that to the extent Defendant's health is declining, evaluators at FMC Butner believe the reason for the decline is more likely nonadherence to his medication regimen than malabsorption of the medication.  2/6/14 Tr. at 98.  By extension, it is very possible that Defendant is causing his own incompetency by not taking his prescribed medications. Dr. Herbel also testified that because Defendant's "competency impairments are mild, he doesn't have to improve much to meet that threshold for competency." Id. at 66; see also 2/7/14 Tr. at 120 (Dr. Cochrane testifying that "if adequately treated, I think he would not have to show much improvement to cross that bar, wherever that bar is . . .").

Addressing Defendant's physical ability to attend court proceedings and stand trial, evaluators concluded he can, "with the only accommodation being a wheelchair and possibly supplemental oxygen."  FMC Butner Report at 30; see also 2/6/14 Tr. at 55, 65. According to evaluators, "If his health status improves, his capacity to actively participate in the court process will likely also improve.  Conversely, if his health status significantly deteriorates, he may be unable to participate in future legal proceedings."  FMC Butner Report at 30.

The parties mainly disagree on whether the mild to moderate AIDS-related dementia can be improved at all with proper treatment of Defendant's medical conditions at a federal medical center. Presumably in an effort to dispute the evaluators' opinion that effective treatment can at least partly reverse his AIDS-related dementia and other symptoms, Defendant's counsel spent a considerable amount of time at the hearings before the undersigned attempting to convince the Court otherwise. In fact, the majority of the testimony and evidence during the hearings centered around whether Defendant's competency can be restored. This was done mainly through the testimony of Defendant's treatment providers, Ms. Dopson and Dr. Joseph, see, e.g., 2/7/14 Tr. at 60-63, and his one-time treating neuropsychologist Dr. Glenn, see id. at 151-56, 176-81. These medical professionals opine that reversal of the AIDS-related dementia is not possible or is highly unlikely.

Defendant ultimately claims he should not be committed to a federal medical center because the circumstances of his physical health are such that the case against him should be abated prior to the Court reaching the commitment issue. To that end, Defendant provided the Court with numerous medical records and a chart showing his declining CD4 levels. See, e.g., Def.'s Ex. 17. Following the evidentiary hearings and during the July 18, 2014 status hearing, Defendant's counsel updated the status of Defendant's health. In sum, Defendant has undergone a series of tests to determine whether malabsorption of his medications or some other factor is causing his declining health. There is no definitive answer, and Defendant is not a candidate for any exploratory surgery. Ms. Dopson states

in a letter to the Court dated July 7, 2014 that she "do[es] not expect for [Defendant] to live through to 2015 if he continues on this path." Def.'s Composite Ex. 18 (No. 18-12).

The Government argues the law requires that it be given a chance to restore Defendant's competency; that Defendant's health problems are not such that the case against him should be abated; and that there is a real possibility that Defendant's health, and consequently his AIDS-related dementia, could actually improve with proper treatment at a federal medical center (see Gov.'s Ex. 3 for articles on improvement of AIDS-related dementia).  The Government also points out in a recent filing that although Defendant enrolled in hospice care sometime prior to his thirty-day commitment, Defendant is no longer in hospice care (Doc. No. 309).  Defendant responded to the Government's filing by asserting that he is still "fighting for his life"; he plans "to enroll in a hospice program once all of the medical testing is done and he has no other avenue left in the attempts to save his life" (Doc. No. 310).

**B.  Law**

In terms of what a Court must do when a defendant is found mentally incompetent to proceed to trial, the applicable statute really gives no discretion:

> If, after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General.

18 U.S.C. § 4241(d).  In turn, the Attorney General is to "hospitalize the defendant for treatment in a suitable facility . . . for a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the

19

foreseeable future he will attain the capacity to permit the proceedings to go forward[.]" § 4241(d)(1).

The Eleventh Circuit has explicitly held "that this statute is mandatory and that the district court [does] not have the authority to circumvent the hospitalization." United States v. Donofrio, 896 F.2d 1301, 1302 (11th Cir. 1990). In Donofrio, it was argued that because the evidence was such that the defendant would "never attain the capacity to permit a trial to proceed," any period of commitment under § 4241(d) would be unreasonable. Id. Rejecting this argument, the Eleventh Circuit discussed and agreed with the Seventh Circuit's decision in United States v. Shawar, 865 F.2d 856, 863 (7th Cir. 1989). See Donofrio, 896 F.2d at 1303.

In Shawar, the district court dismissed the charges against an intellectually disabled[19] and mentally incompetent defendant rather than committing the defendant for attempted competency restoration. Shawar, 865 F.2d at 857. The charges were dismissed because "there was no evidence that his condition would ever improve, and because he did not seem dangerous." Id. Reversing the district court, the Seventh Circuit deemed "not unreasonable" the district court's reading of "the statute to require that commitment only is mandatory if there is a possibility that the commitment will result in a change in the defendant's condition," but found the clear intent of Congress mandated commitment. Id. at 860. Said the Seventh Circuit, "Our reading of 18 U.S.C. § 4241(d) is not only that

---

[19]   Although the term "mental retardation" is used to describe the defendant's condition in Shawar, 865 F.2d at 858, the United States Supreme Court has recently adopted use of the term "'intellectual disability' to describe the identical phenomenon," and the latest edition of the Diagnostic and Statistical Manual of Mental Disorders does the same, Hall v. Florida, ___ U.S. ___, 134 S. Ct. 1986, 1990 (2014) (citations omitted).

commitment is mandatory, but also that likelihood of recovery is not something to be considered by the district court in deciding whether to commit the defendant for the evaluation period." Id. at 861.  Further, "[o]nce a defendant is found incompetent, the Government is entitled to an in-depth evaluation of him, in order to determine whether he is likely to recover." Id. Other circuits too have determined that commitment under § 4241 is mandatory once a finding of incompetency is made. See United States v. Magassouba, 544 F.3d 387, 404-05 (2d Cir. 2008) (collecting cases).

Notably, at least one circuit has recognized that reading § 4241 to always require commitment in every single circumstance without any exception whatsoever "may be an overstatement." United States v. Filippi, 211 F.3d 649, 651 (3d Cir. 2000).  The Filippi court raised as a possible example of an exception if "the defendant was close to death," although no such claim was made in that case.  Id.  The defendant in Filippi suffered from vascular dementia, contended the condition was irreversible, and argued that "confinement for purposes of diagnosis served no legitimate purpose and thus violated the Due Process Clause." Id. at 650.  Affirming the district court's commitment order, the Third Circuit found constitutional § 4241, reasoning in part that "the statute is categorical in determining who shall be incarcerated, but it is much more flexible and case-oriented in determining the length of incarceration." Id. at 652 (emphasis omitted).

Paralleling the question of whether a § 4241(d) commitment is necessary and/or appropriate is the question of whether the case against Defendant should be abated, or indefinitely continued, at this point given the seriousness of Defendant's medical conditions

21

and their alleged effects.[20]  Given that "[m]edical forecasts are uncertain, and the evidence before the judge will rarely point in just one direction," this can be a particularly difficult determination and one that is reviewed for an abuse of discretion.  United States v. Brown, 821 F.2d 986, 988 (4th Cir. 1987); see also United States v. Stitzer, 785 F.2d 1506, 1516 (11th Cir. 1986) (reviewing denial of continuance for abuse of discretion).  "For a denial of a continuance to constitute an abuse of discretion, the medical repercussions must be serious and out of the ordinary; the impending trial must pose a substantial danger to a defendant's life or health."  Brown, 821 F.2d at 988; see also United States v. Zannino, 895 F.2d 1, 13-14 (1st Cir. 1990) (same) (quotation and citation omitted), abrogation on other grounds recognized by, United States v. Gomez-Lemos, 939 F.2d 326, 333 (6th Cir. 1991).  "The fact that the event is by its nature ordealistic cannot abrogate the public interest in bringing those accused of criminal misconduct promptly to account."  Brown, 821 F.2d at 988.

Both parties agree that the factors set forth in United States v. Doran, 328 F. Supp. 1261, 1263 (S.D.N.Y. 1971), guide the determination of whether to abate/indefinitely continue a trial.  Those factors are:

> (1) Naturally, the medical evidence and judgments.
> (2) The related evidence of defendant's activities – at work or play or wherever – outside the courthouse.
> (3) The possible availability of measures (e.g., a shortened schedule, medication, medical equipment) to minimize the risks to defendant's health in subjecting him to a trial.

---

[20]      The Eleventh Circuit has recognized that "[a] finding of mental incompetence to stand trial may arise from mental illness, physical illness, or disability; [intellectual disability] or other developmental disability; or other etiology so long as it results in a defendant's inability to consult with defense counsel or to understand the proceedings."  Watts v. Singletary, 87 F.3d 1282, 1286 n.4 (11th Cir. 1996) (citing ABA Criminal Justice Mental Health Standards, § 7-4.1(c) (2d Ed. 1986)).

(4) The temporary or permanent character of the physical problem, since postponement is a relatively easy, bearable and obvious measure for the case of curable impairments.

(5) The magnitude and seriousness of the case – i.e., the degree of loss or injury to the public interest deemed to result from delay or total preclusion of a trial.

Id. (citation omitted).   Other considerations include "the degree to which a defendant's health might impair his participation in his defense, especially his right to be present at trial, to testify on his own behalf, and to confront adverse witnesses, as well as whether the proceeding is likely to worsen the defendant's condition." United States v. Cole, 631 F.3d 146, 156 (4th Cir. 2011) (quotation and citation omitted).

The defendant in Doran suffered a stroke about two years after the indictment in his case was returned by the grand jury. Doran, 328 F. Supp. at 1261.  Doctors opined he had "hypertension, weakness of the right extremities, a limp, difficulties of speech and expression, pathological obesity, evidence[d] a history of gouty arthritis, insomnia, problems of memory, emotional instability and easy fatigability."  Id. at 1261-62.  Doctors also concluded the defendant "was unable safely or competently to stand trial," so the case was held in abeyance for about five more years (for a total of about seven years) until the Government urged the court to bring the defendant to trial.  Id. at 1262.  Declining to try the defendant, the court in Doran found that he was "severely impaired emotionally and intellectually, so that his ability to remember the ancient facts and assist counsel is at best marginal; and [] the strain and tension of a trial (estimated to require from two to four weeks) pose a substantial threat of producing a severe cardiovascular accident or death." Id. So, the Court "postponed without day" the defendant's trial. Id. at 1264.

23

Relying largely on <u>Doran</u>, in 1996, the Honorable Wm. Terrell Hodges of this Court abated the trial of an 83-year-old defendant who was charged with tax evasion and suffered from "a severe sleep disorder known as sleep apnea, complicated by a neuro-muscular condition, which prevent[ed] him from enjoying any meaningful periods of restorative sleep at night." <u>United States v. Ira M. Koger, Jr.</u>, No. 3:95-cr-66-J-10, Order entered September 11, 1996 (Doc. No. 83) at 1-2.[21] Because the defendant could not meaningfully sleep and was prone to falling asleep during the day when not physically active, he contended he would not be able to participate meaningfully in his trial (which was expected to last one to three months if a normal schedule were followed) and it would violate due process to make him undergo one. <u>Id.</u> at 2-4.

After discussing the <u>Doran</u> factors, Judge Hodges concluded that each weighed in favor of abatement. <u>Id.</u> at 5-9. Physicians opined the defendant could not participate "in a trial in any normal sense"; there was no evidence that the defendant's outside activities were inconsistent with the reasons proffered by the defendant in support of his motion to abate; the defendant's condition was permanent and untreatable; "[a] continuance [would] make it less likely, not more likely, that the case [would] ever be tried"; and the Government had "a powerful civil remedy that [was] still available." <u>Id.</u> at 5-8. In <u>Koger</u>, there was no question of mental incompetency. <u>Id.</u> at 2 n.1. Nor was there any real question of whether the defendant was feigning the disorder or the effects of it. <u>Id.</u> at 6 n.4. Judge Hodges observed that the 83-year-old defendant, who had "no prior criminal record, pose[d] no

---

[21]   A copy of the <u>Koger</u> abatement order is attached as Exhibit B to the Government's Response to Motion to Abate.

24

apparent threat to anyone, physically or economically; and with the IRS [continuing to look] over his shoulder, the likelihood of specific recidivism [was] virtually nil." Id. at 8.

## C.  Analysis/Findings

The parties and the experts agree that Defendant is mentally incompetent to stand trial, and the undersigned so finds by a preponderance of the evidence.  Defendant urges the Court to abate the trial prior to considering whether to commit him under § 4241, so the undersigned takes up the abatement issue prior to the commitment issue.  Consideration of the Doran factors and other relevant considerations in light of the history of manipulation and malingering in the case leads the undersigned to conclude that abatement is not appropriate at this point.

The first factor, the medical evidence and judgments, see Doran, 328 F. Supp. at 1263, is no doubt complex.  Defendant suffers from a variety of ailments, and there are indications that he is getting progressively worse.  There are medical experts (on Defendant's side) who opine he cannot physically handle a trial and withstand its rigors. His treating physician's assistant predicts a rather short life span at this point, as long as Defendant continues on his current path.  And that is the problem.  The undersigned is convinced that this Defendant has chosen to manipulate his medical condition for the worse – to the point of knowingly risking death – to avoid facing trial.  No one except Defendant and his partner will ever know for sure what they are doing and when they are doing it to manipulate Defendant's condition.  But, there is far too much evidence of historical manipulation in the case, and there were far too many red flags at FMC Butner, to be coincidental.  In short, every opinion regarding Defendant's current condition and his life

25

expectancy is undercut by Defendant's efforts to make himself sicker when he believes it will derail the prosecution.[22]

As reflected in the most recent medical records, at least some of Defendant's providers are convinced that there is not much more that can be done to improve his condition. The evaluators at FMC Butner, however, believe that Defendant's condition can improve with proper treatment, and in light of the evidence of Defendant's manipulation of his condition to make it worsen and the evidence of malingering at times in the case, the undersigned credits the FMC Butner opinions in this regard. Even Ms. Dopson recognized that patients with similar CD4 counts as Defendant's can improve with proper care and treatment.[23]   The real questions are whether Defendant is following his prescribed treatment, and what else he is doing to manipulate his medical condition. See Brown, 821 F.2d at 988 (citation omitted) (stating an appropriate consideration is "the steps that defendant himself is or is not taking to improve his condition").

As to the evidence of Defendant's activities outside the courthouse, see Doran, 328 F. Supp. at 1263, there is video surveillance (albeit now about one year old) that shows Defendant acting much more alert and energetic outside his home than he appears in Court, see Order (Doc. No. 229) at 24. There is also more recent evidence from FMC

---

[22]   For this reason, it is futile to make more specific findings regarding the opinions of the experts. Further, their opinions regarding the effects of Defendant's condition are in part based upon what he self-reports to them.

[23]   Indeed, years ago, Defendant's CD4 levels drastically improved after being worse than they are now. The chart that Defendant submitted to show his declining CD4 levels mainly during the course of the case reflects that in 1998 (about the year he was diagnosed), his CD4 count was one (Def.'s Ex. 17); according to Defendant's counsel, that is the lowest CD4 count someone can have. Defendant's counsel also represented during argument that Defendant had other opportunistic infections when he was initially diagnosed with AIDS. By 2006, after treatment and intervention, Defendant's CD4 count had jumped to 604. See id.

Butner of some phone calls in which Defendant acted more alert when speaking to his partner than he presented to evaluators.  See supra at Section II.A.

As to availability of measures to minimize the risks of Defendant's health in subjecting him to a trial, see Doran, 328 F. Supp. at 1263, Defendant claims that the stress of a trial will have drastic effects on his health, a claim that is once again viewed with skepticism and is hard to quantify.  Evaluators at FMC Butner opine that all Defendant needs is a wheelchair and possibly supplemental oxygen.  Also, the undersigned observes that Defendant was able to physically sit through the multi-day evidentiary hearings on the instant matters – although sometimes he appeared sleepy – with only a wheelchair, oxygen, water, and medication reminders on his watch.  In any event, given the mental incompetency of Defendant, the trial is not imminent at this point.  If it becomes imminent, the Court can actively monitor whether additional accommodations are necessary and feasible.

As to the character of the physical problem, see id., Defendant's most serious health problem (AIDS) is not reversible.  There is certainly  evidence suggesting that in the past, when Defendant wanted it to be, it was well controlled.  And finally, as to the magnitude and seriousness of the case, see id., the charges that Defendant faces are very serious and the potential penalties are steep.  Also, the potential for any recidivism is high regardless of how ill Defendant may be: all Defendant needs is a computer and the internet to commit the crimes that he is alleged to have committed.  In sum, the undersigned finds that the Doran factors and others do not dictate abatement at this time.  It may well be that at some point in the future, even the near future, this could change.  There is no doubt that

27

Defendant's medical condition is a moving target.  For now, though, in light of all of the evidence before the Court, the undersigned's best judgment is that the case should advance.

So, given that Defendant is mentally incompetent to proceed, the Court must commit him under § 4241(d) for a reasonable period of time, not to exceed four months, to the Attorney General for hospitalization and treatment.[24]  The undersigned adds that although the law does not appear to require it, there is at least some credible evidence that Defendant's AIDS-related dementia can improve with proper treatment.  Indeed, if evaluators at FMC Butner are right, adherence to the proper medication regimen and proper treatment will not only lead to the possibility of Defendant regaining competency, but will also be relevant to the abatement issue.  A § 4241(d) evaluation also carries with it a possibility of deciding with certainty whether Defendant is malingering.[25]  In sum, there is no doubt that the competency issues are intertwined with the abatement issues; hopefully a reasonable period of commitment will further shed light on both.

The undersigned hastens to add that Defendant did not receive quite the level of medical care the Court was expecting last time he was committed to FMC Butner.  Although it appears that the lead medical doctor on Defendant's case kept an open line of

---

[24]     During the July 18, 2014 status hearing, the undersigned inquired of the Government what amount of time is reasonable for a § 4241(d) commitment given the complexity of Defendant's condition.  The Government responded that it is difficult to determine what is reasonable, but suggested that the Court require status reports of the facility to effectively monitor Defendant's situation.  The undersigned believes the best course is to order commitment, as the statute dictates, for a reasonable period not to exceed four months; the undersigned further recommends requiring status reports every thirty days so the Court can actively monitor the progress (or lack thereof) of the commitment.

[25]     So many of the warning signs were there with Defendant's thirty-day evaluation, but evaluators did not make that finding.

communication with Defendant's family and made efforts to keep the family informed of the progress, Defendant pointed out that his vitals were not taken for many days, and he lost a fair number of pounds during the commitment.[26]  It also surprised the undersigned that FMC Butner did not require Defendant to stay for the entire thirty-day evaluation period; Defendant was released after just twenty-five days.[27]  Especially in light of the reasons for the thirty-day commitment in this case (which the evaluators were aware of), it is odd that Defendant did not stay for that period.   In any event, a federal medical center such as FMC Butner is well equipped to care for Defendant's needs.   In light of the serious medical condition of Defendant and the serious concerns expressed by the Court regarding Defendant's attempts to manipulate his condition, however, it is greatly important for staff at the designated medical center to actively and closely monitor Defendant.

### III.  Conclusion

It is therefore **RECOMMENDED**:

1.     That Defendant's Motion for Abatement of Trial and Incorporated Memorandum of Law (Doc. Nos. S-11, 194) be **DENIED without prejudice**.

2.     That in light of Defendant's incompetency and the foregoing recommendations, the following instructions be included in any final Order on these issues:

> Pursuant to 18 U.S.C. § 4241(d) and § 4247(b), Defendant shall be
> committed for treatment and a psychiatric or psychological examination by
> a designated licensed or certified psychiatrist or psychologist for a

---

[26]     This weight loss could very well have been intentional.  The only two times that the undersigned is aware of in which Defendant has had any significant weight loss during the course of this case were while he was in custody.

[27]     Every defendant who the undersigned has committed for a thirty-day evaluation has stayed the entire commitment period, and often evaluators ask for more time.

reasonable period, but not to exceed four months, to the custody of the Attorney General, or his duly authorized representative(s), for placement in a suitable facility of the Bureau of Prisons. **This treatment shall be conducted in the suitable facility closest to this Court, that is, the Federal Medical Center (FMC) located in Butner, North Carolina.**

The director of the facility shall designate one or more such psychiatrists or psychologists for such treatment and examination. The director of the facility may apply to this Court for an additional reasonable period of time until either: (1) Defendant's mental condition is so improved that trial may proceed, if the Court finds that there is a substantial probability that within such additional time Defendant will attain the capacity to permit the trial to proceed; or (2) the pending charges against Defendant are disposed of according to law.

Given the serious medical condition of Defendant, status reports shall be submitted to the following individuals every **thirty (30) days**:

> Timothy J. Corrigan, United States District Judge, 300 North Hogan Street, Suite 11-100, Jacksonville Florida, 32202;

> James R. Klindt, United States Magistrate Judge, 300 N. Hogan Street, Suite 5-111, Jacksonville, Florida 32202;

> D. Rodney Brown, Assistant United States Attorney, 300 N. Hogan Street, Suite 700, Jacksonville, Florida 32202; and

> Vanessa Zamora Newtson, Esquire and Mark Rosenblum, Esquire, Suite 601, 1300 Riverplace Blvd., Jacksonville, Florida 32207.

Additionally, upon the conclusion of Defendant's stay at the facility, and pursuant to 18 U.S.C. § 4247(c), a psychiatric or psychological report shall be prepared by the examiner designated to conduct the psychiatric or psychological treatment and/or examination. This report shall be filed with the Court and furnished to the above individuals, and shall include the following:

> (1)  Defendant's history and present symptoms;

30

(2)  a description of the psychiatric, psychological, and medical tests that were employed and their results;

(3)  the examiner's findings;

(4)  the examiner's opinions as to diagnosis and prognosis;

(5)  whether Defendant suffers from a mental disease or defect rendering Defendant mentally incompetent to the extent that Defendant is unable to understand the nature and consequences of the proceedings against Defendant or to assist properly in his defense; and

(6)  if Defendant continues to be found incompetent, determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the trial to proceed.

Defendant shall **self-report** to **FMC Butner** on **[an appropriate date and time].**  Defendant shall ensure that he brings with him an accurate list of all his current medications, and he shall ensure that a family member has the medications available in the event that FMC Butner does not immediately have one or more of the medications and determines it is appropriate to continue them.  If Defendant has any specific concerns relating to his medication regime and/or procedures, testing, or imaging to be used during the hospitalization, his counsel shall communicate those concerns to the Government, which shall in turn make them known to the appropriate staff at FMC Butner.  Defendant is to remain at liberty under the conditions of this Court's Order Setting Conditions of Release (Doc. No. 81), as modified, until his report date. The Court will actively monitor the status of this matter through the periodic status reports.

**RESPECTFULLY RECOMMENDED** at Jacksonville, Florida on August 22, 2014.

*James R. Klindt*

**JAMES R. KLINDT**
United States Magistrate Judge

31

kaw
Copies to:

Honorable Timothy J. Corrigan
United States District Judge

Assistant U.S. Attorney (Brown)
Mark Rosenblum, Esquire
Vanessa Zamora Newtson, Esquire